No. 12,918.

51 1428
110 553

A. A. PATON & CO. VS. H. & C. NEWMAN.

SYLLABUS.

A cotton transaction under the rules of the New Orleans Cotton Exchange, between parties who are members of same, is governed by the provisions thereof; and by an agreement of contracting parties they become an incident of such transaction and modify the principles of law applicable thereto.

Under said rules, a contract for the sale of cotton is deemed final, when the price has been agreed upon between the seller and the buyer; and the delivery of same is considered to have been completed when it passes the scales. The buyer is bound to receive the cotton purchased within seven working days from the day of sale; but, after demand has been made upon the press for delivery without avail, same remains at the risk of the seller, who is liable for the loss or deterioration sustained thereto by any fault of his, or by the happening of a fortuitous event.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Theard, J.*

*Branch K. Miller* for Plaintiffs and Appellants.

*Saunders & Miller* for Defendants and Appellees.

Argued and submitted May 6, 1899.
Opinion handed down June 12, 1899.
Rehearing refused June 26, 1899.

The opinion of the court was delivered by

WATKINS, J.   The claim of the plaintiffs is for the sum of $2,165.45, and which sum they seek to recover from the defendants as the amount of damages they sustained in a cotton transaction; and that by reason of their failure to deliver a certain number of bales which petitioners had purchased from them, same were consumed by a fire which destroyed the press in which same were stored, preparatory to delivery.

After answer filed and evidence adduced, the cause was submitted to, and decided by the judge of the lower court; and a judgment thereupon having been pronounced in favor of the defendants, the plaintiffs prosecute this appeal therefrom.

The case as presented in the petition is, substantially, as follows, viz:

"That on the 6th of March, 1895, plaintiffs purchased from H. and C. Newman (776) seven hundred and seventy-six bales of cotton for the following prices, viz: Seven hundred and thirty-seven (737) bales thereof at five and one-eighth (5 1-8c.) cents per pound, and thirty-nine (39) bales thereof at five (5) cents per pound, etc."

That at the time of said contract of sale, said cotton was situated and stored in the International Cotton Press, in the city of New Orleans, and *"that due demand was made for the delivery of said cotton,* " *according to the rules of the New Orleans Cotton Exchange, under* " *which said purchase and sale were made, etc."*

That, "nothwithstanding which (demand) said *H. & C. Newman* " *failed and neglected to deliver* three hundred and fifty-seven (357) " bales of the same (though) the whole of said cotton should have been " delivered by (them) prior to March 21st, 1895, etc."

"That prior to said (date), petitioner had placed said (defendants) " in default under their said contract; and that at about 3 o'clock " a. m. on said March 21, 1895, three hundred and fifty-seven (357)

Paton & Co. vs. Newman.

" bales of said cotton, for (the delivery of) which petitioners as afore-
" said have made due demand, and for the delivery of which said
" H. and C. Newman were in default, were destroyed by fire in the
" said International Cotton Press, etc."

"That the value of said cotton on said 21st day of March, 1895, was
" $1,227.19, in *excess of the price* and sum for which petitioners pur-
" chased it .from (the defendants); that the said cotton, on said date
" was worth to petitioners that amount, over and above the price and
" sum (at which) they had purchased it as aforesaid."

Upon the foregoing statement of facts, the plaintiffs allege that
they are entitled to recover from the defendants the difference between
the price at which they bought and the value thereof on the 21st of
March, 1895.

They further allege, that on the 12th of March, 1895, Allgeyer & Co.,
purchased from the defendants fifteen hundred and fifteen (1515)
bales of cotton, then stored in the International Cotton Press, for the
price of five and one-half (5 1-2) cents per pound for thirteen hund-
red and fifteen (1315) bales, and at five and three-eighths (5 3-8)
cents per pound for the remaining (200) bales.

They allege that due demand for the delivery thereof was made, and
the defendants put in default prior to the 21st of March, 1895, when
the loss by fire occurred.

That of the total number of bales of cotton purchased, two hundred
and ninety-six (296) bales thereof had not been delivered, but had
been destroyed by fire—on the date, at the place, and under the cir-
cumstances detailed with regard to the lot of cotton first described—
the total number of bales in excess thereof having been delivered by
the defendants under said contract.

They allege that on the 9th of March, 1895, J. Herbert Williams
purchased from the defendants three hundred and twenty (320) bales
of cotton for the price of five cents (5cts.) per pound for one hundred
and sixty (160) bales thereof, and four and three-fourths ( 4 3-4) cents
per pound for the remaining one hundred and sixty (160) bales
thereof.

They then recite all the circumstances that are related with regard
to the purchase, demand, default, and loss by fire in the previous cases
as being strictly applicable thereto.

That subsequent to the fire, the defendants delivered or accounted
for to him for two hundred and two (202) bales, less six bales re-

jected, but the remaining one hundred and eighteen (118) bales were neither delivered nor accounted for to Williams by the defendants; but that same having been destroyed by fire at the time, and on the date specified, and its value at that time being $224.40 in excess of the price at which Williams bought, he was entitled to recover the difference in price thereof from the defendants.

The plaintiffs then represent themselves to be the assignees of said Allgeyer and Company and Williams; and allege that the defendants failed altogether to deliver to them, or to either of their assignors, any portion of said cotton prior or subsequent to said fire, except as above admitted, although they had given orders to said International Cotton Press, their bailee, to deliver same, prior to the 21st of March, 1895, when the fire occurred.

They further aver, that prior to said fire, "they duly and repeatedly "made demand upon the proprietors, or operators of said Interna- "tional Cotton Press for the delivery of said cotton, which demands "the former failed and refused to comply with;" and they, as assignees of Williams and of Allgeyer & Co., make similar allegations as to them.

The answer of defendants is, substantially, as follows, viz.:

That all the sales and transactions referred to, were made subject to the rules of the New Orleans Cotton Exchange, and of which all the parties mentioned are members—the defendants being commission merchants, and the other parties cotton buyers.

That all sales of cotton to buyers are made by samples which are placed upon exhibition and conspicuously displayed; but that the purchase by sample is not considered binding on the purchaser, who is entitled to fresh samples actually taken from the bales sold, "and the "sale is not binding on the buyer until he has himself had the bales "inspected," and satisfied himself as to the quality of the cotton sold him.

When the parties have agreed as to price and quality, the merchant then furnishes the buyer with a list of the bales sold—"showing their "marks and the press in which they are stored; and, also, gives the "buyer an order on the cotton press * * * directing the press to "deliver said list of bales to the buyer."

"That the giving of said orders on said cotton press is a *complete* "*delivery, and the only delivery that is expected or required of the* "*seller of the cotton.*" That "when buyers receive such orders, they

" are thereby put *in as complete possession* of the cotton mentioned " therein as the sellers were, and are entitled to take whatever meas- " ures may be necessary in order to compel the *actual delivery of* the " cotton by the cotton press in which it is stored, in order that said " cotton may be inspected, and if accepted after inspection, either " transferred upon the books of the press to the buyer, or else removed " by the buyer."

That under the rules of the Cotton Exchange, buyers "are required " to sample, inspect and receive delivery of the cotton purchased by " them *within seven working days* from the *date of the sale;* which " receiving of delivery by the buyer consists in the acceptance of the " cotton after inspection, and the storage of same in his name"—and failing therein, they are in default, and the commission merchant may, if he wishes, resell the cotton.

The defendants admit a sale of a list of 776 bales of cotton on March 6th, 1895, to plaintiffs, which was on store in the International Press, and that they gave an order on the press therefor—enumerating them, with their marks or brands.

That it was, thereupon, the duty of plaintiffs to have inspected the cotton within seven working days from the date of said orders, and to have demanded of the press immediate delivery if they were willing to accept same; "and that if they permitted it to remain in said " press, without inspecting it, or without enforcing delivery thereof, " whether for their own convenience or for the convenience of the " press, it *remained at the risk of the buyers.*"

The foregoing italics are those of the court.

The defendants represent that "said buyers inspected and accepted " 419 bales of cotton, and inspected and rejected two bales thereof " *after March 21st, 1895;*" and "that on that date a fire occurred " through no fault whatever of theirs; and that it was through no " fault of theirs that plaintiffs had not inspected and received the re- " maining 355 bales of said cotton before the 21st of March, 1895"— the plaintiffs being in default prior to that date in "not inspecting " and accepting or rejecting said 355 bales."

They represent that they are in no wise indebted to plaintiffs "for " any loss occurring on said 355 bales * * * (plaintiffs) having " never completed their purchase of said cotton by inspecting and " accepting same."

With regard to the transaction with E. Allgeyer and Company, they

aver, that, on the 12th of March, 1895, they agreed to sell them a list of 1515 bales of cotton, then stored in the International Cotton Press, made out a list of same, and gave an order for same on the press for the delivery thereof.

That after the receipt of said order, "it was the duty, and was in " the power of (said company) to inspect said cotton within seven " working days from the giving of the order therefor to them, and to " demand and enforce delivery by the press of said cotton, if accepted " after inspection; and, if they permitted it to remain in said press " without inspecting it, or wthout enforcng delivery thereof, whether " for their own convenience, or for the convenience of the said press, " it *remained at the risk of the buyers,* and not at respondents' risk."

Then follows this allegation, viz: .

*"That said buyers inspected and accepted 1063 bales of cotton " before March 21st, 1895, and 114 bales after said date, and inspected " and rejected 50 bales thereof before March 21st, 1895."*

They allege that the remaining 288 bales of the 1515 were consumed by the fire above described, without any fault of theirs; and then follow other allegations similar to those made in reference to the plaintiffs.

The recitals of the answer with regard to the defendants' transactions with Williams are, in all respects, similar to those appertaining to the plaintiffs and Allgeyer and Company.

The general averment is then made that neither of said purchasers made any demand for the delivery of the cotton purchased, other than on the aforesaid orders on the press in which the cotton was stored; but that *"they accepted said orders as a fulfillment of respondents' " obligation to deliver."*

"That the cotton was in said press at the time of said sales, and that all of said vendees could have obtained delivery either for inspection, or, finally, after inspection, had they exercised *due and usual* diligence to obtain delivery; that all of said parties permitted said cotton sold them respectively, to remain in said press, for their own convenence, and probably because they did not require it sooner in their business. That *respondents did not own or control said press,* and were in no wise responsible for its actions."

The foregoing is a substantial reproduction of the petition and answer, and therefrom it appears that there is no material conflict between the parties with respect to the character of the transactions,

the amounts of cotton purchased, and the amounts that the plaintiffs and their assignors actually received *before and after* the destruction of the press wherein the cotton was stored; but there is a difference between them with respect to what constituted a *delivery* under the contracts of sale—that is to say, whether the seller having furnished the press with a list of the bales of cotton sold after the purchasers' acceptance, was a *complete delivery under the rules of the Cotton Exchange,* and put the cotton sold at the buyers' risk.

The following extract from the brief of the plaintiffs puts their case in a strong light, viz:

"Plaintiffs' suit is based upon the theory that all cotton which was " not delivered under the several contracts set out in the petition was " the property of plaintiffs, as between them and defendants; that " without regard to other circumstances, by the conditions of the " agreement to sell, defendants were bound for the delivery of such " cotton, and by their failure so to do results their liability to plaintiffs " for any loss suffered by the breach of their obligation."

From the foregoing synopsis of the petition and answer, it is evident that the principal question for the court to decide is, whether delivery had been made under said contracts; and, if not made, whether same devolved upon the seller or buyer—under the law and under the rules of the Cotton Exchange.

On the one hand plaintiffs allege three several purchases from the defendants; one on the 6th of March, one on the 9th of March, and the other on the 12th of March, 1895; and that on the 21st of March, 1895, the International Cotton Press, wherein all of said cotton was stored for the account of the defendants, was consumed by fire, and, except a few bales, said cotton a total loss.

That, notwithstanding the defendants had furnished to the buyers lists of the cotton sold, and had given orders on the press, their bailee, for the delivery thereof, same was not actually delivered through the fault of the press, and, consequently, the fault of the seller; and that, on that account, the buyers are entitled to recover from the sellers the amount of the appreciation in the price of the cotton, between the dates of the purchases and the date of the destruction of the cotton by fire—the buyers having made due demand upon the press for the cotton within the time-limit fixed by the rules of the Cotton Exchange.

Their further charge is, that subsequent to the fire, and in recogni-

tion of the right of the plaintiffs, Paton and Company, under their contract, the defendants did deliver (419) four hundred and nineteen bales of said cotton which had not been destroyed by fire, and in pursuance of said purchase; but they failed to deliver 357 bales thereof— same having been destroyed by fire.

And their further charge is, that of the 1515 bales purchased of defendants, they delivered to them as assignees of Allgeyer & Co.,. *prior and subsequent* to the fire, all, except 296 bales; and that defendants delivered *subsequent to the fire* (202) two hundred and two bales· to them as assignees of Williams—the remaining (118) one hundred and eighteen not having been delivered on account of having been destroyed by fire.

Consequently, plaintiffs' contention is, that defendants by their conduct in making partial deliveries under the aforesaid contracts before and after the fire, *have conclusively admitted and recognized* the binding force of said sales, and the obligation resting upon them to carry them out in every particular.

On the other hand, the contention of defendants in their answer is, that while, under the custom of the trade, and the rules of the Cotton Exchange, the right is reserved to the buyers to have the bales inspected and weighed before they are finally accepted, the sale is not binding on the buyer; but, that when the buyer agrees on the bales· to be sold on sample, and the seller has given an order on the press· therefor, the said giving of said order on said cotton press, is *a complete delivery,* and the only delivery that is expected or required of the sellers of the cotton.   That when the buyers receive such orders, they are, thereby, put in as *complete possession* of the cotton mentioned therein as the sellers were, and are entitled to take whatever measures· may be necessary in order to *compel the actual delivery* of the cotton by the cotton press in which it is stored.

That while judicially admitting the partial deliveries of cotton plantiffs allege they made, the defendants aver that none of the purchasers made any demand on *respondents* for the delivery of said cotton other than for the orders on the cotton press in which said cotton was stored; that they all accepted orders on said press as a fulfillment of respondents' obligations to deliver, and that the cotton was in said press at the time of such sales, and "that all said vendees could have obtained deliveries  *  *  * had they exercised due and usual diligence to obtain delivery."

By the foregoing judicial admissions of the defendants, the three sales declared upon are, by the defendants, admitted to have been consummated in so far as they are concerned; and their only denial is, of any obligation resting upon them to make an *actual delivery* to the buyers.

Based on these judicial admissions, the contention of defendants is, that plaintiffs did not make any seasonable and proper demand upon the press; and that they, possessing no control or power over the press, could not compel it to make delivery; and that the failure of the press to deliver, was not their fault.

But, in responding to this contention, plaintiffs insist, that the press was the bailee of the defendants as sellers, exclusively, and that the sellers' orders were delivered *to the press* and not to the buyers; and that they made due and timely demand for delivery of the cotton, and without avail.

It is thus made apparent, that both plaintiffs and defendants in their petition and answer state, that the question for the court to decide is, delivery *vel non*.

Both plaintiffs and defendants affirm the completion of the sale— the plaintiffs contending that the duty of delivering was on the sellers, and that to make demand on the press for delivery was all that remained for them to do; while, on the contrary, the defendants contend, that the giving of the orders on the press was all they had to do.

The consequence of plaintiffs' contention is, that the failure of the press to deliver, put the risk on the sellers; while that of the defendants is, that the giving of the orders on the press, put the risk upon the buyers.

To recapitulate, the contentions of defendants in brief and argument are, (1) that by their orders on the press to make delivery, they did deliver the cotton, in so far as it was possible for them to deliver, and that they did thereby all they could do to enable the buyers to obtain actual possession thereof, (2) that said orders on the press having been given, and the fire having occurred after the expiration of the seven day time limit, the buyers are, presumably, in default in not taking the cotton—the burden of proof being on them to establish some valid excuse for not taking the cotton, and that timely and seasonable demand for delivery had been made by them; (3) conceding that the buyers did make enquiry at the press for the cotton within the seven days, that same was not a legal demand, and, therefore, in-

sufficient; (4) that the evidence does not show that defendants had been given any notification of the fact of demand having been made on the press for delivery, and of its failure to make delivery.

These are the questions—and the sole questions—upon which the determination of this case rests.

The response of the plaintiffs to the first three of the foregoing propositions need not be reiterated, as they have been fully stated; but that in regard to the 4th is '(1) such notice was not required under the rules of 'the Cotton Exchange; (2) that in point of fact, the proof does show that such notice was given; (3) that defendants admitted full knowledge of same by making a partial delivery under said contracts, both before and after the sale; and (4) by making the distinct averment in their answer of having made such deliveries both before and after the sale.

There was an agreement made between the parties, to the effect that under the three contracts declared upon, the number of bales and the prices of the cotton are correctly stated in the petition, and it will be, therefore, unnecessary to deal with the testimony on that point.

I.

The first issue of fact tendered by the plaintiffs is in regard to the Allgeyer contract, which is to the effect, that it was made "on contract" in pursuance of the rules of the Cotton Exchange—that is to say, it was a contract for future delivery, at the option of the buyer, at any time during the month within which it was made. On the contrary, the contention of the defendants is, that it was made for an actual delivery, in the ordinary course of business, under the rules of the Cotton Exchange in regard to such sales, just as those of Paton and Williams were; and that the defendants' universal custom was at that time to make no. sales for future delivery, and that that fact was well known to Allgeyer and to the plaintiffs themselves.

We think this matter is disposed of by the allegations made by the plaintiffs in their petition, which are to the effect, that on the 12th of March, 1895, E. Allgeyer & Co. purchased from the defendants, cotton which was then stored in the International Cotton Press in New Orleans; and further to the effect, that due demand for the delivery thereof was made, and the defendants put in default, prior to the 21st day of March, 1895, when the loss by fire occurred.

E. Allgeyer as a witness admits, that under the rules of the Cotton Exchange, buyers are required to take the cotton within seven working days; and that all sales are presumed to be made under the rules of the Cotton Exchange, unless the contrary be stipulated.

He admits that he had been trading a long time in this city, and was familiar with the Cotton Exchange rules; and that he had been engaged in the business in this city of buying and selling cotton for a long time.

In the course of his interrogation, the following occurred, to-wit:

"Q.—And you knew at the time these rules (of the Cotton Exchange) would govern this purchase from Mr. Newman, unless the trade was an express understanding between you and him to the contrary?

"A.—Yes, sir."

On the same subject, Mr. Newman, one of the defendants, said, as will be shown by the following interrogation, to-wit:

"Q.—State fully what your recollection of that conversation is.

"A.—Had Mr. Allgeyer intimated to me that he was buying this cotton to be delivered on contracts, I would not have effected the sale to him, as I always declined to sell on contract to one and all, without exception, up to that time. Later on, in the fall of 1895, when there was a squeeze in cotton, I made a delivery of cotton myself for my firm.

"Q.—This rule of yours was well known?

"A.—Yes; I refused everybody.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Q.—Had you ever sold Mr. Allgeyer prior to that time any cotton to meet future contracts?

"A.—Never to my knowledge.

"Q.—Had he ever, before that, asked you to sell him cotton to meet future contracts?

"A.—No; it was generally known that my firm did not sell cotton for future delivery."

In our view, this testimony is in keeping with the allegations of the petition, and puts the Allgeyer contract upon the same basis as that made by the defendants to the plaintiffs; and this, notwithstanding the testimony of the broker, that he considered it a sale for future delivery.

The Williams contract is, confessedly, on the same plane as that of

the plaintiffs with the defendants. Therefore, taking all the contracts together, we have for consideration the question propounded, as to whether a complete delivery of the cotton was effected under the cir-cumstances above related in the pleadings and argument of counsel.

## II.

The main question is, whether the seller delayed making the delivery of the thing, and thus submitted it to destruction by a fortuitous event; and we are to determine from the evidence whether the listing of the cotton, and the furnishing by the seller of orders on the press where the cotton was stored, was a complete delivery of the thing sold, under the rules of the Cotton Exchange.

The following are the rules of the Cotton Exchange, with regard to "Sale and Delivery of Spot Cotton":

### "WHEN AGREEMENT TO SELL IS FINAL."

"Rule 1. A contract for the sale of cotton shall be deemed final " when the price has been agreed upon between the seller and the " buyer, *provided*, in the case of a sale to a broker, the name of the " buyer is accepted by the seller."

### "LIMIT OF TIME FOR RECEIPT."

"Rule 2. All cotton shall be received within seven working days " from and after day of sale, and if not received within that time, the " seller shall have a right to demand payment of the approximate " value of the cotton; and may, after giving due notice in writing to " the buyer, proceed to have the cotton weighed, and to demand pay-" ment in accordance with such weights."

### "WHEN PAYMENT IS DUE."

"Rule 3. All cotton shall be paid for upon presentation of the brok-" er's invoice, and the broker shall deliver the same upon the day the " delivery is completed, if practicable, or by 2 o'clock p. m. on the day " following."

### "DELIVERY AND INSPECTION."
### "WHEN DELIVERY IS COMPLETE."

"Rule 12. The delivery of cotton shall be deemed to have been " completed as it passes the scales, but the seller shall have an insur-" able interest in same until paid for. In like manner, where pay-

" ments on account are made by the buyer prior to actual delivery, he
" shall be deemed to have an insurable interest in the cotton, and may
" require from the seller an assignment of his policy of insurance to
" the extent of such payments."

"WEIGHING AND RE-WEIGHING."

"DUTIES OF FACTORS' AND BUYERS' WEIGHERS."

"Rule 15. The sellers' weigher shall not weigh any cotton for de-
" livery without the presence of the buyers' re-weigher, unless he shall
" have first given notice to the buyers' re-weigher, or to the buyers'·
" classer, of his readiness to weigh the same at a time which he shall
" specify, etc."

The following is an exact reproduction of Order No. 333, bearing
date March 6, 1895, that the defendants, H. & C. Newman, gave
to the press for the delivery of the Williams cotton, to-wit:

"INTERNATIONAL PRESS."

(333)

"New Orleans, March 6, 1895.

"Please deliver to C. Hanson & Co. the following cotton:

| Date. | Conveyance. | No. of Bales | Marked. |
|---|---|---|---|
| Feby. 9 | I. R. R. | 3 | D. L. & T. S. |
| Jan. 8 | Parlor City. | 1 | F. L. |
| Jan. 15 | Natchez. | 1 | A. H. \| A. |
| Jan. 22 | Natchez. | 1 | Forest (F.) |
| Feby. 6 | Ouachita. | 1 | Lismore (A.) |
| Jan. 22 | Natchez. | 16 | Eureka (V.) |
| Jan. 22 | Natchez. | 2 | F. H. & J. J. |
| Jan. 29 | Natchez. | 8 | Carrie (H.) |
| Feby. 12 | Natchez. | 2 | Joseph (L.) |
| Feby. 13 | Ouachita. | 1 | D. L.    M. |
| Feby. 16 | Camden. | 2 | H. B. 2-3 |
| Feby. 12 | Natchez. | 1 | Carrie W. H. |

39 B. C.

(Signed)    "H. & C. NEWMAN,

"Per M."

Accompanying the foregoing list, is the following order:

Paton & Co. vs. Newman.

"New Orleans, March 6, 1895.

"*Mr. C. Hanson & Co.,*

"DEAR SIRS.—Herewith please find Order No. 333 for 39 bales of " cotton purchased by you this date at 5c.

                    "Respectfully yours,

(Signed)                                    "H. & C. NEWMAN,

                                                "Per M."

All of the various orders and accompanying lists of cotton, are of the foregoing identical description; and an examination of the same discloses that they contain all the necessary *data* to effect a complete and perfect sale, except the weights which are not given.

The orders of the sellers on the press, to deliver a specified number of bales of cotton of particular brands to the person named therein, were sufficient authority to the buyers to make demand upon the press to turn out the cotton specified, for the purpose of having it examined, sampled and weighed, *in order to effect a delivery,* as indicated by the foregoing rules of the Cotton Exchange, and as particularly specified in the defendants' answer.

And it is in this respect that said rules come to our aid in giving an interpretation to the terms of said contracts, one of which provides, that all cotton shall be received within seven working days after the sale, and if not received within that time, the seller may resell the same.

The purport of that provision is, that the buyer is in default if he fail to accept, or receive, or take delivery within that time limit; but it necessarily implies also, that delivery must be tendered by the seller within that period of time, provided the buyer manifests a willingness to accept delivery.

The particular efficacy of said rule is, that it fixes seven days as the definite limit within which the buyer must accept, and of necessity within which the seller must tender delivery.

And its further effect is, that it fixes a specific date at which, and the circumstances under which, the risk is placed upon either buyer or seller, according to the default of either.

That if the buyer fail to make demand for delivery within that time, the thing sold is at his risk; and, if the seller fail to make actual delivery upon said demand being made, it remains at his risk.

Under the law, this question is a matter of proof.

It appears from the foregoing analysis of the contracts, and of the

rules of the Cotton Exchange, that the transactions of the parties relate to a sale of spot cotton in the New Orleans market—the plaintiffs and their assignors being cotton buyers professionally, and the defendants engaged in the business of cotton factors.

It is, therefore, manifest that each of the parties were influenced in making the trade, by their respective appreciations of the probable fluctuations of the market—the buyers anticipating an upward tendency, and the defendants a downward tendency in the price.

Hence, the theory on which plaintiffs brought this suit is, that they and their assignors having bought cotton of the defendants on the 6th, 9th and 12th of March, respectively, at the prices named in their contracts, and same having preceptibly appreciated in market value, prior to the 21st of March, when same was destroyed by fire, and after defendants were placed in default, they were entitled to recover the increased value thereof.

Their contention is, that the rights of all parties were fixed at the date of their contracts, the buyers being responsible for the payment of the purchase price to the sellers, and the sellers being bound to return not only the purchase price, but the increased value of the cotton which was destroyed by fire while it remained at their risk in the hands of *their bailee;* and the price—except in the case of Allgeyer & Co.—not having been paid, the demand of the plaintiffs is for the difference in value between the dates of the sale and that of the loss by fire, only.

In other words, that, inasmuch as the cotton *increased* in value, after the purchases were made, the profits of the transaction belonged to the buyers; and had a loss been sustained, same would have fallen upon them, and they would have been compelled to have paid the seller the entire price without any reduction on account of any diminution in value.

It is a fact established by the record, that all the parties to the several transactions are members of the New Orleans Cotton Exchange, and that same were negotiated by brokers, who were, also, members of the Exchange, and familiar with its rules, and presumably contracted with the defendants in reference thereto.

We have critically examined all the testimony in the record with reference to the character of those dealings, and particularly with regard to the *delivery* of the cotton, and our investigation has led us to the following conclusion, substantially:

That in each instance, immediately after acceptance by the buyers, lists of the cotton sold were made up by the sellers, containing the marks of the bales, and the price per pound, and sent directly to the press wherein same was stored, accompanied by an order for delivery to the party designated therein; that there was at the same time sent to the buyers what are termed "slips," showing that an order for delivery had been sent to the press.

That the press retained these orders in its possession, until demand for delivery had been made; and after delivery had been made, they kept them on file in order to preserve a history of the transaction.

That the cotton is sold at so many cents per pound, upon samples which were exhibited by the sellers, and that on demand of the buyers, the press is expected to turn out the cotton to be sampled, counted and weighed.

That, until it is turned out by the press, sampled, counted and weighed by the buyers, the cotton is not at their risk, but remains at the risk of the sellers—due and timely demand for delivery having been made by the buyers.

That the press in which the cotton is stored is the agent of the sellers, which recognizes their authority and instructions, only; and not those of the buyers.

That the agents and representatives of the buyers—that is, of the plaintiffs and their assignors—went to the press, and made formal and repeated demands for the delivery of the cotton within the limit of seven working days after the date of each purchase, that is to say, the 6th, 9th and 12th of March, respectively, but without avail, because the press was unable to make delivery on account of its crowded condition.

That due notice of said demands having been made without avail, was given to the *defendants* personally by the buyers, and they (defendants) called upon the press to make delivery; and that, as a result of their demands, the press did make a partial delivery to Allgeyer & Co., immediately before and after the fire, and to Williams and the plaintiffs, similar partial deliveries soon after the fire.

In confirmation of the foregoing statement, the cotton-classer of Allgeyer & Co., states that he went to the press and demanded delivery on the 18th, in order to receive the cotton and classify it; and the calendar for the year 1895 shows that the 12th of March occurred on

Monday, and the 18th occurred on Sunday; therefore, a demand made on either the 17th or 19th would have been within the time limit.

He says that he started to work receiving cotton on the 18th of March, and received and weighed five hundred (500) bales, and on the following day about the same number; but that when he returned again the press had been burned, and the remaining cotton destroyed by fire.

That witness assigns the crowded condition of the press as the reason he could not get all the cotton.

That he went repeatedly and demanded the cotton, but. without avail, as the press could not deliver. But he states, that the press did deliver to him for Allgeyer & Co., one hundred and forty-two bales on the 21st of March, the very day of the fire, and one hundred and twenty-one bales on the 22nd of April following—these deliveries being in addition to those he had previously mentioned.

That statement is in keeping with the answer of the defendants.

The broker who made the deal for Williams states that he made demand on the press for delivery of the cotton within the time limit of seven working days, but without avail, and that he, subsequently, notified the *defendants in person* of the failure of the press to deliver,. and requested them to call on the press to give him the cotton.

Not once only, but repeatedly; and that "defendants did all they " could, but they could not perform an impossibility."

That they (defendants) communicated with the press, and then informed him "that they would do the best they could."

That he said it was an utter impossibility for any one to have *compelled* the press to turn out the cotton, in the crowded condition it. was then in.

The classer, inspector and weigher for Williams, each make a similar statement with regard to their repeated and unavailing demands,. and of the impossibility of the press making delivery, on account of its crowded condition; and their statements are corroborated by that of Williams himself.

All of the foregoing testimony is fully confirmed by the yard clerk of the International Press, who was in charge of its delivery department.

He states that demand was made for the delivery of the Paton cotton "over five or six days"; but he failed to say whether from the date of sale on the 6th, or that of the fire on the 21st of March.

But that is of no consequence, because six working days counted from the 6th would carry the time limit forward to the 14th, and counted from the 21st, it would, likewise, carry the time limit back to the 14th—the 11th and 18th being Sundays—that date being within the limit.

He states that several different demands had been made for that cotton without avail, but the delivery was impossible on account of the crowded condition of the press. He says demand was made for the delivery of the Allgeyer cotton four or five days before the fire—that is to say, on the 15th or 16th, and, consequently, within two or three days after their purchase on the 12th.

That demand was, likewise, made for the delivery of the Williams cotton within four or five days after their purchase on the 9th of March.

That in each case repeated demands for delivery had been made upon the press, and without avail; and that he had in his possession the defendants' orders for the delivery, at the time said demands were made.

Henry Newman, one of the defendants, as witness states, that these sales were made under the rules of the Cotton Exchange.

"Q.—Then, these sales were made with reference to the rules of the Cotton Exchange, were they?

"A.—Yes, sir.

"Q.—Of which you are all members?

"A.—Yes, sir; all members."

The following is the receipt that was delivered to the defendants by E. Allgeyer & Co., after the fire, to-wit:

"Received, New Orleans, March 23, 1895, from H. & C. Newman, ten thousand dollars advanced them on a purchase of about 450 (?) B. C. which has been burned in press on the 21st instant.

$10,000.                    "P. Pro. E. ALLGEYER & Co.

                                    "P. REBOLET."

That receipt is annexed to and made part of the defendants' testimony, and constitutes written evidence, *bearing date two days subse quent to the fire* of the recognized and admitted completion of the sale antecedent to the fire, notwithstanding actual delivery of the cotton had not been made, and which is in exact keeping with the rules of the Cotton Exchange.

The evidence shows that the defendants made deliveries to the buy-

ers both before and after the fire; and this fact is admitted in defendants' answer. Also, that Mr. Newman states that he was anxious for the purchasers to get their cotton—"that it was his desire to facilitate the delivery of the cotton."

On the foregoing statement of the evidence, our conclusion is, that the following propositions have been satisfactorily established, to-wit:

(1) That the defendants gave the orders to the press in which the cotton was stored for their account, as their agent and bailee; (2) that the buyers made due demand for the delivery of the cotton within the seven working days after the respective dates of the sales, and that the press declared its inability to deliver on account of its crowded condition; (3) that partial deliveries had been made both before and after the fire; (4) that the actual delivery of a number of bales had not been made at all, and the same were destroyed by fire.

Hence, the failure of the buyers to obtain delivery was, exclusively, the fault of the sellers; as a rule of the Cotton Exchange declares that " a contract of sale *shall be deemed final when the price has been* " *agreed upon between the seller and the buyer;*" and notwithstanding another rule declares that "all cotton shall be *received* within seven " working days from and after day of sale."

Another rule supplements the foregoing, by the declaration, that " the *delivery* of cotton shall be deemed to have been *completed as if* " *passes the scales;*" but it is to be taken in connection with the rule preceding, which declares, that the mere agreement of the parties upon the price, shall constitute the full and final proof of the sale.

The following extracts from the testimony of Henry Newman, gives the defendants' version of the transaction, in connection with the delivery of the cotton:

"Q.—Here is a receipt for ten thousand dollars, signed by Allgeyer & Co.; will you state what you know about that receipt?

"A.—This ten thousand dollars was given to us as an advance payment on the sale made to Allgeyer & Co.

"Q.—When was that sale made to Allgeyer & Co.?

"A.—I suppose it was a sale made on the 12th of March.

*       *       *       *       *       *       *       *       *       *

"Q.—Mr. Newman, then you say in the transaction with Allgeyer & Co., you received about thirty thousand dollars in advance, on the price of this cotton that they bought from you?

"A.—Yes, sir; it may have been only twenty—twenty-five or thirty. I can tell you by looking at the books.

"Q.—Well, anyhow, you had that in your hands at the time of the fire?

"A.—Yes, sir.

"Q.—An advance from Allgeyer & Co., upon the cotton you had agreed to sell?

"A.—Yes, sir.

"Q.—Which you had sold?

"A.—Yes, sir.

"Q.—Was the amount you had from Allgeyer & Co. equal to the total price, or less than the total price?

"A.—It was less than the total price. As far as I had received it. In order to make it understood, from the purchase price of 1500 bales of cotton you could readily see that 1500 bales of cotton at that time, at five and one-half cents, would be in the neighborhood of forty thousand dollars; perhaps he advanced me twenty-five or thirty thousand dollars before he had ever received a bale, etc.

\* \* \* \* \* \* \* \* \* \*

"Q.—Then at the time of the fire which was on March 21st, you had in your hands ten thousand dollars of Allgeyer's money, for which he had received no cotton?

"A.—He had the order for it."

### III.

But, aside from the testimony of other witnesses in regard to the *defendants* having been duly notified of the repeated demands which had been made on the press for delivery, and of its failure to deliver, the fact of their having been so notified, is shown by the following extract from the testimony of Henry Newman, to-wit:

"Q.—Will you tell me in what time after the sale on the 6th of March, A. A. Paton & Co. came to see you about this cotton; how long after the 6th of March was it, that you heard from them about the cotton?

"A.—On the 19th.

"Q.—On the 19th?

"A.—On the 19th of March, A. A. Paton & Co. (this young man Cameron told me) he sent up for the cotton and couldn't get it, and he asked me to assist him in receiving the cotton.

Paton & Co. vs. Newman.

"Q.—What did you do then?

"A.—I telephoned up to the press, and the reply was, that it would deliver the cotton on the morning of the 21st; on Thursday; this was on Tuesday.

"Q.—Well, what did Mr. Cameron say when you got that message back from the press and gave it to him? ·

"A.—Perfectly satisfactory; it was done while he was there.

"Q.—Well, after the 9th of March, when the sale was made, when was the next time you heard from Mr. Williams, or any one representing him about this cotton?

"A.—Mr. Williams called in my office in person.

"Q.—Do you recollect the date?

"A.—It was on Wednesday, the 20th day of March.

"Q.—Well, what conversation took place between you and him?

"A.—I telephoned up to the press, and they replied that they had so much cotton to deliver on the following day, and on Friday, that if I would postpone it until Monday he would be certain to get his cotton the Monday following.

"Q.—The Monday following the 20th of March?

"A.—Yes, sir.

"Q.—Did you communicate that reply to Mr. Williams?

"A.—Mr. Williams was there at the office when I telephoned up, so I communicated to him.

"Q.—What did he say?

"A.—He said that was the best he could do; that he would like to have it as the ship was going off, or something of that kind.

\* · \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q.—Now, will you state as nearly as you can the conversation that occurred between Mr. Williams and yourself, when Mr. Williams came to see you about this cotton?

"A.—Yes, sir; to the best of my recollection, Mr. Williams called on me, accompanied by Mr. Mazarett, his broker, and complained to me that he had sent up to the press, and couldn't get his cotton. I told him that *I would do the very best I could for him,* and I went to the telephone \* \* \* but the reply that was received was, that they were to deliver the cotton on the following day, but the pressure was so great, that it would not allow them to deliver Mr. Williams' cotton.

"Q.—Well?

"A.—And I so reported it to Mr. Williams in person.

"Q.—Standing very near the telephone?

"A.—No, sir; I came out in the office and told him.

"Q.—What did he say?

"A.—He says, 'I suppose I will have to wait,' or something to that effect.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"Q.—With whom did you converse with regard to the Paton cotton; who called on you about that?

"A.—Mr. Henderson and Mr. Cameron.

"Q.—Now, what did they say when they called on you?

"A.—They said that they sent up to the press and couldn't get the cotton; that was the universal cry that season."

There is no doubt of the evidence having established as a fact, that the defendants had been duly notified, personally, and previous to the fire of timely demands having been made by each one of the buyers on the press, and without avail.    If notification to the defendants, personally, of the demand of the buyers upon the press, and of its default, be regarded as requisite for the purpose of fixing responsibility upon them as principals, and placing the cotton at their risk at the time of the fire, the evidence fully establishes that they received such notice, and that the notices were given almost simultaneously by all the buyers.

The evidence not only shows, that the defendants had notice of said demand having been made on the press, and of its non-delivery of the cotton, but knowledge also of the reasons assigned by the press for non-delivery; and that this knowledge came to them contemporaneously with the demands having been made, and that they acted upon it, communicated with the press in regard to it, and urged it to make delivery at once.

The evidence further shows that the press was the bailee of the sellers, and, as such, had the cotton in store, and their orders for the delivery thereof, in its possession; and that by reason of the failure of the press to deliver, the buyers were deprived of the enjoyment of the profits which, legitimately, accrued to them on these transactions, on a rising market after the sales, and previous to the fire.

## IV.

The principles of law, applicable to the foregoing state of facts, are

embodied in the provisions of the Code, except so far as same are modified by the rules of the Cotton Exchange, which by the terms of the contracts, must control—said contracts having been made in pursuance of said rules.

Rule 1 provides that "a contract for the sale of cotton shall be "deemed *final,* when the price has been agreed upon between the "seller and the buyer;" while the language of the Code is, that "the "sale is considered to be perfect between the parties, and the property "is of right acquired by the purchaser with regard to the seller, as "soon as there exists an agreement for the object and price thereof; "although the object has not yet been delivered, nor the price paid."

Rev. Civil Code, 2436.

The difference between the two is most material in establishing the rights of parties, because the language of the rule that "a contract for the sale of cotton shall be deemed *final* when the price is agreed upon between the buyer and the seller," is equivalent to saying, that the sale is final and complete by a mere agreement as to the price; while the language of the Code, that "the sale is considered to be perfect between the parties," is not absolute.

Another material difference is that rule 12 declares "that "the delivery of cotton shall be deemed to have been completed, "as it passes the scales," without making the delivery one of the conditions of a perfect sale; while the delivery is made a condition of the perfect sale by the Code.

Rev. Civil Code, 2456.

Another material difference is, that rule two provides, that "all cot-"ton shall be received within seven working days from and after day "of sale, and if not received within that time, the seller shall have the "right to resell the cotton"; whereas there is no such limit stipulated in the Code.

The effect of these rules, in our appreciation, is to declare—as stated therein—that a contract for the sale of cotton shall be deemed final, when the price has been agreed upon between the buyer and the seller, independently of the time when actual delivery thereof has been made; and that the question of actual delivery under the rules, is a condition subsequent, and has exclusive reference to the risk alone, and is not an essential element of the sale.

Rule two provides that all cotton shall be received within seven working days after the day of sale, and rule twelve provides that the

delivery of cotton shall be deemed to have been completed, as it passes the scales; but neither of them makes mention of loss or injury resulting from a fortuitous event.

But, the Code provides that, "until the thing sold is delivered to the buyer, the seller is obliged to guard it, as a faithful administrator; and if, through want of this care, the thing is destroyed, or its value diminished, the seller is responsible for the loss (Revised Civil Code, 2468); and, "the seller is released from this degree of care, when the buyer delays obtaining the possession, but he is still liable for any injury which the thing sold may sustain, through gross neglect on his part" (Rev. Civ. Code, 2469); and "if it is the seller who delays to deliver the thing, and it be destroyed even by a fortuitous event, it is he who sustains the loss, unless it appear certain that the fortuitous event would equally have occasioned the destruction of the thing in the buyer's possession after delivery." Rev. Civ. Code, 2470.

The foregoing provisions of the Code are supplemented by the general terms of the following article, to-wit:

"In all cases, the seller is liable to damages, if there result any detriment to the buyer occasioned by the non-delivery at the time agreed on." Rev. Civ. Code, 2486.

In this case, a rule of the Cotton Exchange is imperative, to the effect that "all cotton shall be received within seven working days from and after the day of sale;" and—as we have said before—that declaration necessarily imposes upon the seller the duty of making delivery within that time, in·case of the buyer's readiness to receive it; and, as the proof discloses that repeated demands were made by the buyers within the time limit, and that neither the sellers nor the press, as their bailee, were able to deliver, it necessarily results that the seller is liable to the damages that have resulted to the buyer, occasioned by the non-delivery at the time agreed upon.

The result of the foregoing analysis of the rules of the Cotton Exchange, taken in connection with the articles of the Code is, that while a contract for the sale of cotton shall be deemed final when the price has been agreed upon between the buyer and the seller, yet, the cotton sold is at the risk of the seller, until he has made actual delivery within the time limit of seven working days, provided the buyer has shown his readiness to receive the same.

That the buyer can require of the seller, either the delivery of the cotton, or damages, in case of loss by a fortuitous event.

That in case of the delivery not being completed, the seller is bound to guard the thing sold, and if it be lost or destroyed, he is responsible for the loss. That if the seller delays the delivery of the thing sold and it is destroyed, even by a fortuitous event, it is he who must sustain the loss.

That in all cases, the seller is liable to damages if there result any detriment or loss to the buyer, occasioned by the non-delivery at the time agreed upon, under the rules of the Cotton Exchange.

In Seris vs. Bellocq, 17th Ann., 146, quite a similar cotton transaction was involved—the plaintiff having sued the defendants for the delivery of eighteen bales of cotton sold by weight, or to pay damages, judgment was rendered in the lower court compelling defendants to deliver the cotton, or in default thereof, to pay plaintiff $1,690.50, damages therefor.

The statement of the case is as follows:

"On the 11th of March, 1862, plaintiff paid defendants eight hundred dollars for eighteen bales of cotton sold to him at ten cents per pound, to be delivered at the Mississippi Cotton Press, in New Orleans. On the 24th of April, 1862, all cotton in the press was taken out by force, and nearly all burned.

"Defendants proved that on the 17th of March, 1862, they ordered and caused to be weighed in the press, eighteen bales of cotton, and that this cotton was in the press on the 24th of April, 1862, and that most of it was burned."

Upon this statement, the opinion of the court says:

"Defendants have invoked the custom of merchants, but they have not proved delivery, as required by custom;" and they affirmed the judgment appealed from.

That case was a stronger one for the defendants, because the proof showed that the cotton was sold by weight, and actually weighed in the press; and that defendants were given judgment for double the amount they had paid for the cotton—declining to give effect to the weighing of the cotton as a complete delivery.

In Gleason & Clark vs. Sykes, 18th Ann., 627, plaintiffs sued the defendant for the repetition of the price of ninety-four bales of cotton which they had purchased, and for which they had paid.

. In the statement of the case, the court say:

"The cotton was destroyed by fire before it was counted or deliv-

ered to the plaintiffs, and the only question now to solve is, at whose risk was this cotton at the time of its destruction?

"The judge of the first instance was of the opinion, and decided, that the sale was not one in *gross,* but one by *tale;* that it never became perfect, and that the cotton remained at the risk of the seller."

Thereupon the court said:

"We are satisfied the loss of the cotton occurred before the expiration of the *three clear days,* which, by the announced condition of the public sale, * * * purchasers were allowed to remove it; during which whole delay it was to remain at the risk of the seller."

And, thereupon, they affirmed the judgment in favor of the plaintiffs.

In Larue vs. Rugely, 10th Ann., 242, a case quite similar to the instant one is stated.

The facts of the case are as follows:

"On the 26th of February, 1853, Larue and Prevost purchased from the defendant 219 bales of cotton, then in a warehouse and press at New Orleans, called Alabama Press. On the afternoon of the same day, which was Saturday, defendant gave the purchasers' brokers a list of the marks of the bales, and wrote at the foot the following orders: 'Alabama Press will please deliver the above lot of two hundred and nineteen bales of cotton to Messrs. Guerin and Sanchez.'

"On the following Tuesday, the brokers sent a clerk to have the cotton turned out for classing and marking, but the pressman having other cotton to turn out, said, he could not do so this day, but probably would be able to do so the next day. * * * On the same afternoon about 6 o'clock, the cotton not having yet been marked, classed, weighed, nor even turned out, it was destroyed by fire.

"It appears from the evidence that the course of business at the press was for the purchasers' broker to present his orders, one, two, or three days after the purchase, and sometimes longer, have the cotton turned out by the pressman, and classed and marked by the broker or his clerks, and the cotton weighed by a weigher appointed by the seller."

"The plaintiffs brought suit to get back their advance of three thousand dollars on the sale, and the defendant's answer was that 'they sold to plaintiffs 219 bales of cotton, and gave their brokers an order on the Alabama Press for the same; that plaintiffs were to pay respondent 8 11-16 cents per pound for the said cotton.'

"That plaintiffs did not use due diligence to have the cotton turned out, marked, classed and weighed as they were bound to do, but 'permitted it to remain in the press where it was stored till Wednesday night, 2nd March, when it was destroyed by fire.'

"Respondents show that by their negligence aforesaid, they became responsible for the loss of cotton burnt as aforesaid."

The court, in considering the foregoing statement of the case, said:

"We deem it sufficient for the purposes of the present case to say, "that there was not a clear and complete delivery of this cotton, as "between vendor and vendee, before the fire.

"We consider the orders on the pressman in favor of the buyers' "broker an initiatory step towards such delivery, which, as between "this purchaser and seller was to be completed by subsequent acts, to- "wit: the turning out the cotton by the pressman to enable the pur- "chasers' broker to class and mark it, and the weighing by the seller's "weigher."

And, thereupon, the court concluded:

"We think there is no error in the judgment below, which was in "favor of the plaintiffs, and it is therefore affirmed with costs."

In our conception, it would be difficult to find a case more completely apposite in all of its details to the instant one; and, for similar reasons, we think the plaintiffs entitled to judgment.

In that case, the broker who made the deal sent a clerk to have the cotton turned out for classing and marking, but the pressman having other cotton to turn out, said he could not do so that day, and probably could not have done so until the fololwing day; but, on the following day, the cotton not having been yet marked, classed, weighed, or even turned out, was destroyed by fire, and the sellers were held responsible for the loss.

In that case, as in the instant one, the sole contention of the defendant was, that by giving orders on the pressman, in favor of the buyers, that a complete delivery of the cotton was effected, in so far as to place the risk upon the buyer; but, the court held that the defence was not a good one, and that such an order was only an initiatory step towards such delivery, which did not put the risk on the purchaser.

Now, in this case, the proposition is correct, for the stronger reason that under the rules of the Cotton Exchange, "a contract for the sale of cotton shall be deemed final when the price has been agreed upon

between the seller and the buyer," thus rendering no further step necessary for the perfection of the sale.

And, the proof disclosing that the buyers tendered full compliance with the rule, by offering to receive the cotton within seven working days from the date of the sale, the burden was upon the seller to complete the sale by making actual delivery.

In the case last cited, the demand was for the repetition of the price actually paid for the cotton in advance, but plaintiffs' right to recover rested upon the perfection of the sale.

And the same is necessarily true of the plaintiffs' claim in this case, for the increased value of the cotton.

If he had a right to demand the return of the price because the cotton was at the risk of the seller, he had, necessarily, an equal right to demand and receive the increased value thereof between the date of sale and the fire.

In our opinion, the rules of the Cotton Exchange are in harmony with the articles of the Code and decisions cited; and the evidence clearly shows that the failure of the sellers to effect a complete delivery of the cotton within the time-limit of seven working days, subsequent to the agreement of sale, puts the fault and loss on them, and the judgment appealed from should be annulled and reversed, and one rendered in favor of the plaintiffs for the amount they demand.

It is therefore ordered and decreed, that the judgment appealed from be annulled and reversed; and, it is now ordered and decreed that the plaintiffs and appellants do have and recover of and from the defendants and appellees, the sum of two thousand one hundred and sixty-five dollars and forty-five cents ($2,165.45), with legal interest from judicial demand, and all costs of both courts.